**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Roland Black, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:18-cv-6518 |
| v. | ) | |
| | ) | |
| Officer Priscilla Hernandez, Officer Zermeno | ) | |
| (first name unknown), and the City of Chicago, | ) | |
| | ) | The Honorable ___ |
| | ) | **Jury Demanded** |
| Defendants. | ) | |

## COMPLAINT

### INTRODUCTION

1.      After Defendant Chicago Police Officer Priscilla Hernandez bungled a simple traffic stop on January 24, 2014—leading to a car chase, a crash, and the escape of an unknown suspect on foot—she decided to cover for herself by framing an innocent man. That man was Roland Black, the plaintiff in this action. Roland spent multiple months in prison awaiting trial because of Officer Hernandez's false accusations against him. He suffered physically and mentally due to his needless incarceration.

2.      Officer Hernandez destroyed (or caused to be destroyed) the evidence that would have shown conclusively that Roland was innocent: the driver's license of the person she actually pulled over, and the dash-cam footage showing a different person—not Roland—get out of the upturned car and run away.

3.      Officer Hernandez intentionally and maliciously caused Roland to be arrested and ultimately prosecuted for crimes related to the January 24, 2014 traffic stop and car chase. Officer Hernandez knew that Roland was innocent of these crimes, and had absolutely no probable cause to cause his arrest and prosecution.

4.       Roland was held in jail from his arrest until his trial on August 10, 2017. On that date he was acquitted and was released from custody shortly thereafter.

5.       Therefore, Officer Hernandez violated Roland's rights under the Fourth and Fourteenth Amendments of the United States Constitution and should be liable to him for compensatory and punitive damages as well as attorney's fees and costs.

## JURISDICTION AND VENUE

6.       This action is brought pursuant to 42 U.S.C. § 1983 to redress the Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

7.       This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331.

8.       Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district; and the events giving rise to Plaintiff's claims asserted herein all occurred within this judicial district.

## PARTIES

9.       Ronald Black is a 37-year-old man. He is currently a resident of the state of Illinois.

10.       Defendants Priscilla Hernandez and Zermeno (first name unknown) are officers with the Chicago Police department employed by the City of Chicago. At all times relevant to the events described in this Complaint, Hernandez and Zermeno were acting under color of law and within the scope of their employment with the Chicago Police Department.

11.       Defendant City of Chicago is an Illinois municipal corporation that is or was the employer of Defendant(s) Unidentified Chicago Police Department Employee(s). The City of Chicago is liable for the policies and practices of the Chicago Police Department.

## FACTS

12.     On January 24, 2014, at approximately 6200 South King Drive, Officer Priscilla Hernandez pulled a red Buick Regal over for making an illegal left turn.

13.     According to her sworn testimony in a prior proceeding, Officer Hernandez asked the individual driving the car for his driver's license, physically took possession of the license, wrote a ticket based off of that license, and put them both in an envelope.

14.     Hernandez testified that she sent the ticket and license to a traffic court.

15.     Hernandez did not inventory the license or ticket.

16.     According to Hernandez's testimony, after she took the license, the driver fled the scene. Hernandez and her partner Officer Zermeno followed the red Buick Regal in their patrol car.

17.     The red Buick Regal crashed into several other parked cars. The Regal came to rest on its side and was disabled.

18.     Hernandez and Zermeno pulled up behind and to the side of the Buick Regal. The disabled Buick Regal was in view of the dash-cam on Hernandez's patrol car.

19.     The dash-cam on Hernandez and Zermeno's patrol car was activated and recording at the time.

20.     At that point, the unknown driver exited the Buick Regal and fled on foot in full view of the dash-cam.

21.     Officers Hernandez and Zermeno were unable to apprehend the unknown suspect. He escaped on foot.

22.     In the case report regarding this incident that Hernandez authored, there is no driver's license number nor any mention of Hernandez asking for a driver's license in the narrative.

23.     According to the transcript of the police radio traffic at the time of this incident, Roland Black's name is not mentioned until after Officer Hernandez has returned to the station—at which point she ran the plates of the red Buick Regal and discovered that the vehicle was linked to Plaintiff Roland Black.

24.     The traffic court—to which Officer Hernandez testified she sent the driver's license and ticket—has no record of any such license or ticket.

25.     In fact, on information and belief, Hernandez and Zermeno caused the ticket and license to be intentionally destroyed or misplaced to cover up the fact that Roland Black was not the suspect who had been driving the Buick Regal.

26.     At some point after January 24, 2014, but before any video footage could be turned over to Roland's criminal defense attorney, the dash-cam footage from Hernandez and Zermeno's patrol car was purged and destroyed.

27.     On information and belief, Hernandez and Zermeno caused the dash cam footage to be destroyed to cover up the fact that Roland Black was not the unknown suspect who fled the disabled Buick Regal on January 24, 2014.

28.     Officers Hernandez and Zermeno knew that either of those items of evidence—the license or the dash-cam footage—would show that Roland Black was totally uninvolved in the traffic stop, chase and crash.

29.     Despite her knowledge of Roland Black's innocence, Hernandez falsely reported that Roland was the driver of the Buick Regal.

30.     On information and belief, the reason that Hernandez intentionally caused the evidence to be destroyed, and intentionally caused the arrest of Roland Black whom she knew to

be innocent, was to cover up the fact that she botched a traffic stop and allowed a suspect to escape.

31.     Officer Zermeno, who like Hernandez was fully aware that Roland Black was not the unknown suspect who had been driving the Buick Regal, intentionally acquiesced to Hernandez's false statements and failed to intervene to prevent the wrongful arrest, detention and prosecution of a man he knew was innocent.

### *The Arrest, Detention, and Prosecution of Roland Black*

32.     Based solely on Officer Hernandez's knowingly false report, and Officer Zermeno's intentional acquiescence to the false statements in that report, a warrant was issued for Roland Black.

33.     Roland Black was arrested by members of the Chicago Police Department based on that warrant.

34.     Roland Black was charged with multiple crimes in case number 14-CR-03581-01 (State of Illinois, Cook County). All the charges were based entirely on Hernandez's knowingly false statements.

35.     Roland was on supervised release (i.e. parole) at the time for an unrelated conviction. Because he was arrested and charged in case 14-CR-035810-01, his parole was revoked and he was imprisoned until he could be tried for the crimes that Hernandez falsely accused him of.

36.     The only reason for Roland's parole to be revoked was the knowingly false statements of Officer Hernandez and Officer Zermeno's knowing acquiescence to those false statements, and the unlawful destruction of evidence that would have proven his innocence.

37.     Were it not for Officer Hernandez and Officer Zermeno's intentional dishonesty—despite their knowledge that absolutely no probable cause existed to charge Black with any crime related to the botched traffic stop—Roland would have remained a free man.

38.     On August 10, 2017, a bench trial was held. Officer Hernandez was the only witness.

39.     On that same day, after hearing Officer Hernandez's testimony, the judge acquitted Roland of all charges. He was a free man.

40.     Once Roland was acquitted, his purported parole violation was invalidated and he was released from custody.

## COUNT I – 42 U.S.C. § 1983

## Wrongful Detention

41.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

42.     In the manner described above, Defendants, acting as an investigator individually, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff, including the prolonged pre-trial detention of the Plaintiff, without any probable cause for doing so and in spite of the fact that they  knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments of the United States Constitution.

43.     In doing so, Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause, and to be detained without probable cause, resulting in injury.

44. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

45. As a result of Defendant's misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

46. Plaintiff's injuries were caused by employees of the City of Chicago, who acted pursuant to the policies and practices of the Chicago Police Department described in more detail below.

## COUNT II – 42 U.S.C. § 1983

### Violation of Plaintiff's Due Process Rights

47. Defendants withheld, suppressed and fabricated evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

48. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

49. Defendant Hernandez destroyed and fabricated evidence relating to the identity of the driver of the red Buick Regal she pulled over on January 24, 2014. This evidence fabricated by Hernandez includes, but is in no way limited to, the proclaimed obtainment of his driver's license. On information and belief, Defendant Hernandez also caused the destruction of dash camera footage that would have proved Mr. Black' innocence.

50. The actions of Defendants deprived Plaintiff of his constitutional rights, including, but not limited to, his right to due process and his right to be free from seizures of his person, including imprisonment, without probable cause.

51. The Defendant Officers' misconduct resulted directly in the prolonged and unjust criminal prosecution of Plaintiff and the wrongful revocation of his supervised release from incarceration, thereby denying his constitutional right to be free of unlawful detention without probable cause.

52. As a result of the Defendants' misconduct, Plaintiff suffered emotional distress. These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm, but failed to do so.

53. The misconduct described in this Count was objectively unreasonable, and was undertaken and committed intentionally.

54. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

55. Plaintiff's injuries were caused by employees of the City of Chicago, who acted pursuant to the policies and practices of the Chicago Police Department described in more detail below.

### COUNT III– 42 U.S.C. § 1983

### Policies and Practices of the City of Chicago

56. The constitutional violations at issue in this case were caused by the official policies of the City of Chicago, which were implemented by its employees, including the named Defendants. The City of Chicago failed to promulgate express policies, allowed widespread

practices and customs to persist, and took actions through its final policymakers, which resulted in the violation of Plaintiff's rights at issue here.

57.     In particular, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures regarding: (a) the arrest and charging of citizens by the Chicago Police Department, including the disclosure of evidence in criminal proceedings; and (b) the training, supervision, and discipline of Chicago Police Officers.

58.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by policymaking officials for the City of Chicago and the Chicago Police Department.

59.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures caused routine violations of the constitutional rights of citizens of the City of Chicago, including Plaintiff's constitutional rights.

60.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices and customs of Chicago Police Officers under which citizens were arrested for, charged with, and prosecuted for crimes by members of the Chicago Police Department without probable cause, based on false evidence, and without being provided exculpatory evidence in the possession of the Chicago Police Department.

61.     Specifically, Chicago Police Officers routinely arrested, charged, and caused citizens to be prosecuted, while knowing that there was no probable cause to suspect citizens of the offenses in question, by inventing false evidence to inculpate innocent individuals, by making false police reports that falsely reported the circumstances of a crime or investigation, by

suppressing evidence relating to the offense, including witness statements, and by providing false statements to other prosecuting, judicial, and law enforcement authorities.

62.    Policymaking officials had notice of these widespread practices and customs of the City of Chicago and failed to take action in response.

63.    These widespread practices and customs of the City of Chicago resulted in routine violations of the constitutional rights of citizens of the City of Chicago, including Plaintiff's constitutional rights.

64.    Evidence of the City of Chicago's widespread practice and custom of subjecting citizens to arrest, charges, and prosecution without probable cause, based on false evidence, and without disclosure of exculpatory evidence is similarly widespread. Among other things:

   a.   Starting in the 1980s, the Chicago Reporter found that tens of thousands of citizens were arrested in Chicago neighborhoods in cases that almost never resulted in a conviction because Chicago Police Officers would not show up in court to defend the arrest. The American Civil Liberties Union challenged this pattern and practice of illegal arrests in the lawsuit *Michael Nelson v. City of Chicago*, 83 C 1168 (N.D. Ill.).

   b.   In the 1990s, the pattern of illegal seizures continued with the City's so-called "gang loitering ordinance," under which thousands of citizens were arrested without justification. The Supreme Court later declared the practice unconstitutional in *City of Chicago v. Morales*, 527 U.S. 41 (1999).

   c.   In the 2000s, illegal seizures by the Chicago Police Department remained common. In 2003, the American Civil Liberties Union again filed suit, this time on behalf of Olympic Gold medalist Shani Davis and others, alleging illegal

seizures by Chicago Police officers. *Davis v. City of Chicago*, 219 F.R.D. 593 (N.D. Ill. 2004) (No. 03 C 2094), 2003 WL 23800673.

d. In April 2016, the Chicago Police Accountability Task Force confirmed that searches and seizures of African-Americans like Plaintiff occurred at much higher rates than searches and seizures of the rest of the population.

e. In the past decade, the City has litigated and lost dozens of civil rights lawsuits contending that arrests, prosecutions, and convictions were secured without probable cause, based on false evidence, and/or because material exculpatory evidence was suppressed, including:

  i. In 2006, the city of Chicago agreed to a $2,000,000 settlement with Eric Kittler. *Kittler v. City of Chicago*, No. 03 CV 06992 (N.D. Ill.). Kittler was wrongfully convicted of murder and spent five years in prison before being acquitted after retrial. His conviction was obtained when Chicago Police Officers forced a false confession from him, and concealed and altered records to cover up his actual innocence.

  ii. In 2007, the City of Chicago agreed to a $20,000,000 settlement with Madison Hobley, Aaron Patterson, Leroy Orange and Stanley Howard based on their wrongful convictions. The four men were all wrongfully convicted after being tortured by John Burge. They were pardoned in 2003.

  iii. Also in 2007, a federal jury awarded Timothy Finwall $2,000,000 against the City of Chicago for his wrongful arrest. *Finwall v. City of Chicago*, No. 04 CV 4663 (N.D. Ill.). Finwall was wrongfully arrested for attempted

kidnapping, after officers misreported the results of a lineup to falsely reflect the victim picked Finwall.

iv.      In 2009, a federal jury awarded $21,000,000 in damages to Juan Johnson against the City of Chicago. *Johnson v. City of Chicago*, No. 05 CV 1042 (N.D. Ill.). Johnson was wrongfully convicted ofmurder, and spent 15 years in prison as the result of fabricated evidence.

v.       In 2013, the City of Chicago agreed to a $10,250,000 settlement with Alton Logan, *Logan v. City of Chicago*, No. 09 CV 5471 (N.D. Ill.). Logan had been wrongfully convicted of a 1982 murder, a crime he did not commit. His conviction was obtained when Chicago Police Officers including John Burge concealed and withheld exculpatory evidence.

vi.      Also in 2013, Eric Caine reached a $10,000,000 settlement with the City of Chicago. *Caine v. City of Chicago*, No. 11 CV 08996 (N.D. Ill.). Caine was wrongfully convicted of double murder after officers working for Jon Burge tortured him into a false confession.

vii.     In 2017, the City of Chicago approved a $30,999,000 settlement with Michael Saunders, Vincent Thames, Harold Richardson and Terrill Swift, the so called "Englewood 4." Each man spent around 15 years in prison for a rape and murder they did not commit. They were convicted based on coerced confessions, and only freed when DNA evidence established the identity of the actual killer.

viii.    In December 2016, a jury in *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), found that the Chicago Police Department maintained a policy and

practice of suppressing material exculpatory evidence in secret files for decades, awarding Fields who was wrongly convicted as a result of the policy more than $21,000,000.

    ix.     In 2017, a federal jury awarded Deon Patrick more than $13,000,000 for the 25 years he spent in prison after being wrongfully convicted of murder. *Patrick v. City of Chicago*, No. 14 CV 3658 (N.D. Ill.). Patrick was tortured, coerced into confessing, and faced a case built on evidence fabricated by police.

    f.    These examples demonstrate that the Chicago Police Department's pattern and practice of falsely arresting, prosecuting, and convicting citizens, and particularly African-American citizens, is longstanding and widespread.

    g.    Many of these illegal arrests, prosecutions, and convictions have resulted in settlements approved by the City of Chicago. Between 2008 and 2016, for example, the City paid judgments and settlements in a minimum of 700 false arrest cases, paying tens of millions of dollars to citizens whose constitutional rights had been violated by Chicago Police officers.

65.    In addition to the widespread practices discussed above, the violations of Plaintiff's constitutional rights were also caused by the City's failure to adequately train, supervise, and discipline its officers. At all relevant times and for a period of time prior thereto: (a) Chicago Police Officers were permitted to arrest, charge, and prosecute citizens without proper training, supervision, or discipline by supervisors in the Chicago Police Department with knowledge of what constituted permissible basis for criminal charges and how evidence should be collected, maintained, and transmitted to the criminal justice system, among other subjects;

and (b) employees of the Chicago Police Department formally and informally adhered to a "code of silence," whereby Chicago Police Officers, their supervisors, and other employees of the City of Chicago agreed explicitly and implicitly not to report misconduct committed by employees of the Chicago Police Department, creating an environment of lawlessness, without discipline, where employees of the Chicago Police Department engaged in misconduct without fear of reprisal.

66.     The widespread practices and customs of the City of Chicago described above are themselves evidence of the City's failure to train, supervise, and discipline Chicago Police Officers.

67.     In addition, in March 2015, the American Civil Liberties Union found that Chicago Police officers were hardly ever trained to conduct seizures after their initial training at the police academy. The American Civil Liberties Union also found that there was no evidence that Chicago Police seizures were being supervised by responsible Chicago Police supervisors.

68.     The U.S. Department of Justice's January 13, 2017 Investigation of the Chicago Police Department (DOJ Report, available at https://www.justice.gov/opa/file/925846/download) likewise found that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field." DOJ Report, at 93.

69. On the subject of supervision, the DOJ concluded among other things that "[I]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffers as a result." DOJ Report, at 105.

70. The failure of police supervision and discipline in the City of Chicago during the relevant time period, and the persistence of a code of silence, has been admitted by City policymakers and by Chicago Police Officers:

      a. In December 2016, the President of the police officers' union in Chicago admitted that there is a "code of silence" in the Chicago Police Department.

      b. In 2017, the U.S. Department of Justice found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence."

      c. The Mayor of the City of Chicago has acknowledged that a "code of silence" exists within the Chicago Police Department.

71. In addition, federal juries have found that the Chicago Police Department maintains a code of silence and fails to supervise and discipline its employees. Each of the following illustrative cases resulted a significant judgment that put the City of Chicago on notice of its failure to supervise and discipline officers:

a. In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury found that as of 1994 the Chicago Police Department maintained a code of silence that facilitated misconduct committed by officer Miedzianowski, who is now serving a life sentence in federal prison.

b. In the case of *Obrycka v. City of Chicago et al.*, No. 07 C 2372 (N.D. Ill.), a federal jury found that as of February 2007, "The City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

c. In 2017, a federal jury in *Laporta v. Chicago*, No. 14 C 9665 (N.D. Ill.),found the City of Chicago maintained a policy of failing to supervise and discipline officers, awarding $44,700,000 in damages against the City of Chicago based in part on the widespread failure to discipline officers. Defendant Officer Patrick Kelly used his service weapon to shoot a friend in the head. Kelly was named in dozens of complaints, and had multiple arrests and a record of alcohol-based misconduct. Additionally, he had been named as a civil defendant six times. Kelly was not charged by prosecutors for the shooting.

d. Also in 2017, the City of Chicago agreed to a $20,000,000 settlement in a lawsuit alleging the City's *de facto* policy of a code of silence enabled officer Joseph Frugoli. *Manzera v. Frugoli*, No. 13 CV 05626 (N.D. Ill.). Frugoli killed a person while he was driving drunk. The Chicago Police Department hid evidence of Officer Frugoli's part in the death, as well as his past record of alcohol based misconduct.

e.  The same constitutionally defective oversight system in place during the time periods at issue in the *Klipfel* case and in the *Obrycka* case were in place between 2014 and 2017, when Plaintiff suffered the abuse described above.

72.  The City of Chicago has long been aware that its supervision and discipline of police officers is inadequate. Nonetheless, it has taken no action to ensure that police officers who commit misconduct are disciplined.

73.  The U.S. Department of Justice found, "Chicago seldom holds officers accountable for misconduct." DOJ Report, at 46.

74.  In the seven years leading up to the DOJ Report, when a citizen made a complaint against a Chicago Police Officer, the Chicago Police Department sided with the officer and against the complainant 98% of the time. This one-sidedness extends to officers who fabricate or manipulate evidence in violation of Chicago Police Department Rule 14. In its report, the U.S. Department of Justice concluded: "[O]ur investigation found that IPRA and BIA treat such efforts to hide evidence as ancillary and unexceptional misconduct, and often do not investigate it, causing officers to believe there is not much to lose if they lie to cover up misconduct. Investigators employ a higher standard to sustain claims against officers for making false statements under what is known as a Rule 14 charge and they rarely expand their investigations to charge accused and witness officers with lying to cover up misconduct. Nor, until recently, has the City focused much attention on officers' efforts to conceal by mishandling video and audio equipment or by retaliating against civilians who witness misconduct." DOJ report, at 8.

75.  Serious abuses by Chicago Police Officers go entirely undisciplined by supervisors in the Chicago Police Department and policymakers in the City of Chicago. For example, in 2001, Chicago Police Officer Joseph Miedzianowski was convicted of several

corruption charges. The Chicago Police Department ignored dozens of complaints against him. In 2011, Chicago Police Officer Jerome Finnigan was convicted of myriad corruption and misconduct charges. He, too, was not timely disciplined by the City of Chicago. In 2013, Chicago Police Sergeant Ronald Watts pleaded guilty to several federal corruption charges. The after effects of Watts's crimes are still being felt. In November 2017, fifteen people had their convictions vacated in Cook County as a result of Watts's misconduct. Watts also was not meaningfully disciplined by the City of Chicago. For decades, Chicago Police Officers Jon Burge and Reynaldo Guevara secured the wrongful conviction of numerous African-American and Latino men through the use of torture, physical violence, and other extreme investigative misconduct. Their misconduct alone has led to millions of dollars of liability for the City of Chicago. Burge was convicted of federal crimes. These officers, too, were never timely or meaningfully disciplined by the City of Chicago.

76. The City of Chicago has never implemented substantive measures to address the obvious deficiencies in its training, supervision, and discipline of Chicago Police Officers.

77. Between 2004 and 2016, the City paid more than $500 million to settle or pay judgments in police misconduct cases, without even conducting disciplinary investigations in more than half of the cases, and while recommending discipline in fewer than 4% of those cases.

78. The City has paid $90,000 in settlements for police misconduct cases involving Officer Hernandez in particular. She was accused of participating in a false arrest of an African-American man on September 1, 2010 (N.D. Ill. case 11-cv-7820). The City paid $50,000 to settle those allegations. Officer Hernandez was also accused of participating in an illegal search and seizure—breaking into the home of a woman, with guns drawn, for whom there was no

warrant—on March 1, 2015 (N.D. Ill. case 15-cv-7029). The City paid $40,000 to settle those allegations.

79.     The U.S. Department of Justice "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding for excessive force.

80.     Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority."

81.     Between 2011 and 2015, nearly half of complaints filed against police officers were not even investigated.

82.     All of the above widespread practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged, allowed, acquiesced in, and/or turned a blind eye to the very type of misconduct discussed above, by failing to adequately train, supervise, and control Chicago Police Officers, by failing to promulgate policies, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses, such as those affecting Plaintiff.

83.     The above-described widespread practices, so well-settled as to constitute *de facto* policy within the Chicago Police Department, were able to exist and thrive because policymakers, acting under color of law with authority over the same, exhibited deliberate indifference to the problem, thereby effectively ratifying it.

84.     For years, these policymaking officials for the City of Chicago stood shoulder to shoulder with the Defendant Officers, helped to maintain the code of silence, and participated in the suppression of material evidence, despite the violations of Plaintiff's rights.

85.     All of the misconduct described in this Complaint was undertaken pursuant to the

official policies of the City of Chicago described in this Count.

### JURY DEMAND

Plaintiff,  Roland Black hereby demands a trial by jury pursuant to Federal Rule of Civil

Procedure 38(b) on all issues so triable.

Respectfully submitted,

**ROLAND BLACK**

By: s/ Michael P. Persoon                                            Dated: September 25, 2018
    One of Plaintiff's Attorneys

Thomas H. Geoghegan
Michael P. Persoon
Michael A. Schorsch
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511